### Chicago Anderson Pressed Brick Company

### v.

### Frank Sobkowiak.

*Master and Servant—Brick Company—Negligence—Personal Injuries —Caving of Clay Bank—Order by Foreman—Instructions.*

1. By a contract of employment, the employe takes upon himself the ordinary hazards of the business as conducted under the system adopted by his employer.

2. The fact that an employer conducts his business by a method that is not the safest possible in the premises, does not constitute negligence, or render him liable to an employe for an injury received in the course of his employment; but for the employer not to use ordinary care that the conduct of his business by the method adopted should not inflict injury upon such of his employes as use ordinary care, would constitute negligence.

3. Where a servant protested against going under a bank of overhanging clay, on the ground that it was dangerous, but was positively ordered by his foreman to go under the same, on penalty of discharge for disobedience, and obeyed the order and was seriously injured, *held*, that a finding by the jury that he was not guilty of negligence was justifiable.

4. It was proper for the court to refuse to allow inquiry whether there was any contract as to what portion of the judgment plaintiff should have in case of recovery.

5. Exceptions to instructions examined and overruled.

[Opinion filed December 12, 1892.]

Appeal from the Circuit Court of La Salle County; the Hon. Dorrance Dibell, Judge, presiding.

Messrs. FOWLER BROS. and EVANS & KELLEY, for appellant.

Messrs. DUNCAN & GILBERT and O'CONOR, DUNCAN & ECKELS, for appellee.

MR. JUSTICE CARTWRIGHT. This is the same case which has been before this court twice prior to this appeal, and which is reported in 34 Ill. App. 312, and 38 Ill. App. 531. On the former appeals the judgments in favor of appellee were reversed on account of errors in the instructions, and because of the verdicts being regarded as excessive. The case has been again tried on the same issues as before, and appellee obtained a verdict for $8,500, from which $2,500 was remitted, and the court after overruling a motion for a new trial entered judgment for $6,000.

On the last trial there was some contradiction by the superintendent as to the language used by him, but in our judgment, the facts which the jury would be justified in finding from the evidence as the basis of their action in determining the liability of appellant, were as follows : In 1887 appellant was procuring clay for use in its factory at Chicago, from a clay bank on the side of a bluff near La Salle, Illinois. The bank had been opened for a length of several hundred feet, and its face at the place in question was about thirty feet high from the level of the pit at the bottom to the top of the bank. The mining of clay was commenced at the foot of the bluff and carried forward into the side of the bluff, leaving the bottom of the pit on a level with the ground outside. The clay laid in strata, and that which was mined and shipped to Chicago was called No. 1, and was about ten feet in thickness from the bottom of the pit. Above this was about twenty feet in height of worthless clay and dirt, covered on top with stumps and a growth of shrubs and grass, and filled near the top with roots. Ever since appellant had been mining this clay the custom had been to blast or otherwise loosen or dig out the No. 1 clay, and when sufficient clay had been taken out,

the bank above would slide down, or was pried off or blasted off, throwing it down on the floor of the pit, from whence it was removed as worthless.  As the blasting out and removal of the clay from beneath progressed, the bank above would project more and more until it would slide down or be forced off by prying or blasting.  In this way the undesirable portion was disposed of from below and was not stripped off from the surface.  The clay when mined was loaded into dump carts and hauled to canal boats, by which it was taken to Chicago.  Appellee commenced to work at this clay bank in February, 1887, and worked there until June 2, 1887.  John Keily was superintendent of the work and had entire charge of it.  He hired and discharged the men, kept their time, directed and controlled their work, and was the only officer or representative of appellant exercising such control, or present where the work was carried on.  On June 2, 1887, the clay at the place of the accident had been taken out so that the bank above projected about ten feet.  On the day previous one of the drivers, Early, refused to drive under the overhanging bank, and Keily told him to go up on top and put it down.  Early went up on the bank where a crack had been opened about four inches wide between it and the hill, but it was held from falling by roots connecting it with the hill.  Early tried to loosen it with a crowbar, but was ordered by Keily to come down and attend to his cart, and did so.

Early said the bank would come down, and Keily said it would not.  Early returned to his cart but refused to drive under the bank.  He was not at work at that point, but he would not drive under it when coming out.  On June 2d, at the noon hour, Michael Boyle, who had charge of the blasting, fired a blast in the clay and immediately afterward the men went to work.  Boyle called Keily's attention to the bank, and told him that it was not safe, and that he had better take the bank down before he put any men under there to work.  Keily replied that he wanted to get that clay out before the surface material should come down and dirty all the clay; that he could get

plenty of men, but that he wanted to get the clay out. One cart was loaded after dinner, and Keily's son, who was driving a cart, backed up at the spot where the accident happened. The shovelers were standing there and appellee was among them, and there was some reluctance manifested to going under the bank. Keily told them to go in and to hurry up and load up the carts. The custom was to have one shoveler on each side and one in the rear of the cart. Appellee commenced shoveling from one side of the cart, and there was a difficulty among the men as to who should go behind it, there being two at the side where appellee was. Keily told appellee that his place was behind the cart and ordered him to go there. Appellee objected on account of the dangerous condition of the bank, and said that if it should come down it would kill a man. Keily assured him that the bank was all right, and appellee, still fearing danger, went behind the cart. Keily had told his son, who was driving the cart, that if he got the word to drive out he should drive out quickly. Appellee had put in about three shovels of clay when the bank fell. Keily gave the word and his son drove out, and the men at the side of the cart escaped, but the bank fell on appellee, who was in a more dangerous position, and he was seriously injured.

It is contended by appellant that the conclusion of the jury was wrong, for the reason that the overhanging bank was one of the usual and ordinary conditions arising from the manner in which the business was conducted, and was therefore one of the risks of the employment assumed by appellee; that the condition of the bank at the time was known to appellee and that what was said by Keily would not relieve him from the operation of the rule. It is true that by his contract of employment appellee took upon himself the ordinary hazards of the business conducted according to the system adopted by appellant. If he chose to accept the employment or to continue in it with knowledge of such hazards, he must be held to have voluntarily encountered them and must bear the consequence. As has been often said, "the mere relation of master and

servant can never imply an obligation on the part of the master to take more care of a servant than he may be reasonably expected to take of himself." Appellee, therefore, took the risk of injury necessarily resulting from the mode of mining the clay in use—by removing the clay until the bank above would slide down or could be pried or blasted off. That risk was not continuous, nor was there constant and immediate danger on account of it, but it was entirely absent or was varied in degree from time to time as the work was done, dependent upon the excavation and the extent to which it was carried before the bank above was removed. The fact that appellant conducted its business in that way and that it was not the safest way, would not constitute negligence or render it liable, but it would be negligence for appellant not to exercise ordinary care that the mining of its clay by the system under which it was conducted should not inflict damage on those who used ordinary care in working under that system. A bank overhanging in some degree was a usual incident of the system in use, but the risk on that account was shifting and variable, depending on the manner in which the control and superintendence of Keily was exercised. In this instance the system of mining was, by direction of Keily, prosecuted in a grossly negligent manner, to an extreme apparently far more dangerous than the ordinary mode. There is nothing to indicate that the usual method was the reckless one adopted on this occasion of continuing the excavation in the face of the probability of serious injury to the men, instead of removing the bank by one of the methods of prying or blasting in use as a part of the usual system under which the business was conducted. There was plainly a lack of ordinary care to provide that unnecessary damage should not be inflicted on appellee by the system in use. He had assumed the incidental risks attending the mining of clay at that bank by that system, but on this occasion a greater risk of the same general nature as the ordinary risks, due to improper and negligent execution of the system, was presented to him and he declined to encounter it. He claimed that it was

not a hazard to which he was bound to expose himself under his contract of employment. If he had voluntarily incurred the risk, then to compensate him for the injury would be to reward negligence on his part; but it was neither of his own will nor judgment that he incurred it. Keily ordered him in and protested that it was safe to go in. By the order, and assurance appellant directly contributed to the injury, which would not otherwise have occurred. It would not seem reasonable to hold that appellee must bear the consequences of the risk which he was directed to assume and was unwilling to incur, merely because he yielded to the order given to assume it, and did not take upon himself the responsibility of throwing up the employment instead of obeying the order, provided he was not guilty of negligence in so obeying the order. If he was guilty of no negligence he might recover for the injury consequent upon his obedience. This is, in substance, the rule adopted in this case as stated in 38 Ill. App. 531.

Whether he was guilty of such negligence involves a consideration of all the circumstances. It is to be remembered that there was the habit of obedience as well as the duty of obedience to the commands of Keily acting upon the mind of appellee; that his fears were allayed to some extent by Keily's assurance, and that he would naturally assume that the order was given in good faith, and that Keily, who was presumably his superior in knowledge and judgment, knew better than he whether the bank would fall before the clay could be got out, and would not order him into a place of actual danger. In view of these considerations and all the circumstances, we think there was no negligence on the part of appellee precluding a recovery.

It was thought on the former appeals that the damages allowed were so excessive as to require reversals. The evidence on the last trial shows that appellee's condition was much worse than at the earlier trials. By the accident his nose and cheek bone and the bones of the palate were broken, his right eye was seriously and permanently injured, he was ruptured, and the injury resulted in curvature of the

spine, which has become greater with the lapse of time. He was reduced from a strong man of 180 or 185 pounds to 135 pounds and was unable to do ordinary labor. It is claimed that the evidence of a worse condition rests mainly on the testimony of J. C. Hatheway, a doctor who testified in the case, whose testimony, it is urged, was of a partisan and unreliable character. The proof in that respect does not, we think, depend on his testimony alone, and from all the evidence we are satisfied that appellee's condition is worse than at the former trials, and that the damages are not so excessive as to warrant an interference with the verdict on that account.

There is but one objection made to the ruling of the court upon the admission of evidence, and that is that the court refused to permit appellant to inquire whether there was any contract or understanding as to what portion of the judgment appellee should have if a judgment should be recovered. In this there was no error. Stearns v. Reidy, 135 Ill. 119.

No instructions were asked on the part of appellee. Appellant asked twenty-six instructions, of which five were refused, and after modification of some of the others, the remaining twenty-one were given. The questions of law involved in the case were few and within narrow compass, and the instructions given were largely reiterations of the same propositions in slightly different language. They were of the most liberal character toward appellant and presented every phase of the law to which it could be entitled. Complaint is made that the court modified some of these instructions by inserting the words "if such are the facts" after the recitals of matters of fact in the instructions. It is urged that the court thereby required the jury to find the facts as absolute facts, beyond any reasonable doubt, and not merely from the preponderance of the evidence. We are unable to see it in that light. Some of the instructions were long and involved in their statements as to facts, and the only effect of the modification was to make it more clear that the rule of law depended on the facts being so found by the jury.

It is further objected that the court modified some of the instructions, so as to add to the conditions recited in the instructions under which the jury were directed to find for the appellant, the further condition that a reasonably prudent person would not have gone into the clay pit at the time the order was given. Each of the instructions so modified purported to state a complete defense, and directed a finding by the jury if the facts were found as stated. They undertook to state what facts or knowledge on the part of appellee would bar a recovery on account of negligence on his part, either because he knew the condition of the bank and the probable dangers, or because he omitted to require the bank to be made safe, or to protect himself against it, or to report its condition. As requested, they told the jury, in substance, that if such were the facts, then appellee did not exercise the ordinary care required by law for his own safety.

The eighth and seventeenth expressly stated that if certain facts were proven then appellee did not exercise reasonable and ordinary care which the law required of him. It was proper to add the modification so as to require negligence to be found as a matter of fact, which it unquestionably is. The refused instructions were all rightly refused. The fourth stated that if appellee, with knowledge of the condition of the bank, continued to work in the pit, he assumed all the risks. It ignored the order of Keily, and for that reason was properly refused. The twelfth related to the question of fellow-servants, and all that was good in it was given in the seventh, eleventh, thirteenth and fourteenth. Besides, it disregarded Keily's exercise of authority, which was the only fact in the case involving their relations. It was rightly refused also, because there was no question relating to fellow-servants in the case. There was no charge or complaint of any act done or omitted by Keily related to his duties as a co-laborer with appellee. The act complained of was the wrongful exercise of his authority as superintendent of the men and the work. He was clothed with authority to command and direct, and it was the manner in

which he exercised such authority of which complaint was made.  As to such acts he was not a fellow-servant with appellee.  C. & A. R. R. Co. v. May, Adm'x, 108 Ill. 288.  The eighteenth instruction singled out an alleged expression of Keily and gave it prominence, ignoring all evidence of other expressions by him, and was rightly refused.  The twentieth was long, misleading, involved, and inconsistent with itself, and could only perplex the jury and work confusion if given.  The twenty-sixth instruction was refused under these circumstances.  At the close of the final argument at 5 P. M., appellant's instructions were not ready, and the court at the request of counsel extended the time for presenting them twenty minutes from that time, to have them run through a typewriter.  Court was adjourned until the next morning, and twenty-five instructions were finally handed to the judge at 8:20 P. M.  The one in question was presented the next morning when the court was about to instruct the jury.  The court showed unusual indulgence and favor to appellant in the extension allowed, and it has no cause to complain that a limit was finally reached.  The instruction was unnecessary in some features and bad in others.  The requirement it contained as to preponderance of evidence was given to the jury in the third and sixth instructions.  The remainder of the instruction stated, in substance, that if Keily's order left appellee free to refuse to go into the pit to work until the bank was made safe, then it was not such a command or coercion as would make appellant liable.  There was no question but that appellee was not deprived of his freedom and might have refused to obey and left the employment, but that fact alone would not prevent a recovery.  The judgment will be affirmed.

*Judgment affirmed.*